E. STANLEY LIBBEY & another *vs.* GEORGE C. TIDDEN & another.

T. EDWARD SHEEHAN (intervening petitioner) *vs.* SAME.

Norfolk.　November 24, 1905. — May 19, 1906.

Present: KNOWLTON, C. J., MORTON, HAMMOND, LORING, & SHELDON, JJ.

*Mechanic's Lien. Contract. Seisin. Husband and Wife. Dower.*

On the trial of a petition to establish a mechanic's lien, one of the respondents claimed the real estate in question under a mortgage which he contended was made and recorded before the making of the contract under which the petitioner sought to establish his lien. It appeared that three days before the purchase of the land and the making of the mortgage the prospective purchaser intending to erect a building on the land asked the petitioner, who had been furnished with the plans and specifications of the architect, for what he would do the mason work, the carpenter work and the roofing, and the plaintiff said that he would do it for $71,000, to which the prospective purchaser replied "All right, I will give you the contract," that the amounts and times of payments were not agreed upon, but it was agreed in a general way that they were to be made as the floors went on, and it also was agreed that the petitioner was to have later

what was known as a "uniform contract," being the form of contract adopted and recommended for general use by the American Institute of Architects and the National Association of Builders, that the next day the petitioner drove some stakes to indicate where the excavation for the cellar was to be made, and after the purchase of the land had frequent interviews with the purchaser in regard to the building, that about three months later the petitioner sent two carpenters to the land to put up the batter boards and on six successive days in the next month laid the brick of cross walls in the cellar at an estimated cost of $700, that on the second day of the following month, a contract in writing was signed by the petitioner and the purchaser of the land, and "there was no particular reason why it was not signed before," that the contract was written upon the uniform contract blank, and provided that the petitioner should provide all materials and perform all the work mentioned in the specifications except cut stone and gas piping, that in addition to the terms of the oral contract dates of payment were specified, and there were provisions that the building should be finished by a certain time, that the petitioner should allow the purchaser of the land insurance money and in regard to other details. The lien sought to be established was principally for materials and labor furnished after the execution of the contract in writing. A judge, sitting without a jury, found that the instrument in writing did not in any essential particular alter the existing oral contract and was an affirmation of it and not a substitute for it, so that the materials and labor were furnished by the petitioner under a contract which was made before the making of the mortgage, and the judge ordered that the lien of the petitioner be established as against the respondent claiming under the mortgage as well as against the purchaser of the land. _Held_, that the finding of the judge as to the time when the contract was made was warranted.

Comments by HAMMOND, J. on the doctrine of instantaneous seisin as applied to dower, showing that even where the seisin of the husband was instantaneous the wife may have dower if the seisin was in the husband beneficially for his own use.

On a petition to establish a mechanic's lien, as in the case of dower, a mortgagee can take advantage of the doctrine of instantaneous seisin only where the mortgage was made to secure the purchase money or some part of it.

At the trial of a petition to establish a mechanic's lien, one of the respondents claimed under a mortgage made to a title company by the owner of the land at the time he acquired title to it, which was after he had made the contract with the petitioner under which the petitioner furnished the materials and labor for which the lien was claimed. The respondent claiming under the title company contended that the seisin of the owner of the land was instantaneous so that the petitioner's lien did not attach to the land as against the mortgage. There was evidence warranting findings, that the owner of the land wished to accomplish two things, one being to get the title to the land and the other to get a building loan to enable him to put up the building on the land for which he had made the contract with the petitioner, that the title company agreed to make the building loan but refused to lend the money to pay for the land, whereupon an individual agreed to lend the purchase money, that the following deeds were recorded simultaneously in the following order: 1, the deed to the owner, 2, his mortgage to the individual lender of the purchase money, 3, the mortgage to the title company; and that the title company did not intend to pay any of the purchase money as such, although a part of its first advance under the building loan was used to pay and discharge the mortgage given for

the purchase money. A judge, sitting without a jury, found that the acquisition of the title to the land and the mortgage to the title company were separate transactions, and ordered that the lien of the petitioner be established as against the mortgage. *Held*, that the finding was warranted.

Where one intending to purchase certain land has made a contract for the construction of a building upon it and thereafter acquires the title to the land and makes a mortgage of it as a separate transaction for a building loan and not to secure the purchase money, the contractor for the building can establish a lien for the materials and labor furnished by him which will be good against the mortgage without showing any ratification of the contract by the owner of the land after he acquired the title to it and before he made the mortgage, no ratification being called for because the contract was his already.

Where labor and materials are furnished under a contract for the construction of a building for a person who at the time of making the contract has not the title to the land on which the building is to be built but who afterwards acquires it, the lien extends as well to the labor and materials furnished before the deed was delivered as to those furnished afterwards, and in proceedings to establish the lien it does not matter whether or not the contract was an entire one for a round price.

An architect cannot maintain a petition to establish a mechanic's lien for labor performed under an entire contract to prepare plans and specifications and supervise the erection of a building for a round sum of money, there being no lien for the work of preparing the plans and specifications.

HAMMOND, J.    This is a petition to enforce a mechanic's lien upon a lot of land in Brookline, upon which an apartment hotel known as Putnam Chambers has been erected. The petition as amended alleges that the work was done under a contract between the petitioners and the respondent Tidden, by the terms of which the petitioners were to furnish all labor and materials required for the erection and completion of the building, except the foundation, cut stone, gas piping, electric wiring, heating, plumbing and painting, for the sum of $71,000; that under this contract the petitioners proceeded to furnish labor and materials actually used in the construction of the building; that without their own fault they were prevented from fully performing the contract by reason of Tidden's failure to perform his part, and that there is due to them a balance of $26,372.65, as shown in an account annexed, for which amount the lien is claimed.

An intervening petition was filed by Sheehan, alleging a contract between him and Tidden, by which Sheehan was to prepare plans and specifications and supervise the erection of the building for $2,500. The intervening petition contained allegations similar to those in the original petition as to the partial performance of the work and the prevention of its com-

pletion, and as to the ownership of the property; and alleged that there was due as a reasonable compensation for the work done the sum of $975, for which amount a lien is claimed.

Tidden appeared, but filed no answer. The respondent Skinner filed an answer in which he denies generally the allegations of the petition, and alleges that on April 2, 1902, the date of the contract described in the amended petition, Tidden was not the owner of the premises, and did not have any right, title or interest in or to the same until April 14, 1902, on which day the owner conveyed to him and at the same time and as a part of the same transaction he mortgaged the premises to the Massachusetts Title Insurance Company for the sum of $80,000, and that both the deed and mortgage were recorded together, so that Tidden had only an instantaneous seizure of the land ; that the mortgage was duly foreclosed and that Skinner purchased at the foreclosure sale, and is now the owner free from all liens which may have accrued subsequent to the mortgage. The answer further alleges that at no time before the recording of the mortgage did the petitioner make any contract with the owner, or any person having authority from him ; that his labor and materials were not performed or furnished by virtue of any agreement with or by the consent of the owner or any person having authority from him before the date of the mortgage, and that no notice was given to the owner before the date of the mortgage. A similar answer to the intervening petition also was filed by Skinner.

The case was referred to an auditor. At the trial in the Superior Court the case was heard by a judge sitting without a jury, the only evidence being the report of the auditor together with nine exhibits. The judge found for the original petitioners for the amount claimed, and for Sheehan in the sum of $800; and ordered that liens be established for these respective sums. The case is before us upon certain exceptions alleged by the respondent Skinner to the findings of fact made by the judge, and to the orders establishing the liens as well as to certain rulings and refusals to rule. In considering the case the term " petitioners " will be used to designate only Libbey and Dixon, the original petitioners. Sheehan, as hereinbefore seen, is an intervening petitioner.

1. As to the contract: One of the grounds of the defence is that the contract under which the petitioners claim was not made until after the mortgage under which Skinner held. As to this the judge found that, on April 11, 1902, a contract was made between Tidden and the petitioners Libbey and Dixon, " whereby the firm was to furnish labor and materials necessary to construct the mason work, carpenter work and roofing of" the building "for the entire price of $71,000. The amounts and times of payments were not agreed upon, but it was agreed in a general way that they were to be made as the floors went on. It was also agreed that Libbey and Dixon were to have later what is known as a 'uniform contract,' being the form of contract adopted and recommended for general use by the American Institute of Architects and the National Association of Builders. The 'uniform contract' was given on August 2, 1902, but that instrument did not in any essential particular alter the existing contract of April 11, and was an affirmation of it and not a substitute for it."

The respondent contends that the above findings are not warranted by the evidence. Inasmuch as the only evidence was the auditor's report and the exhibits, this point must be decided by an inspection of the report. Upon this question the auditor reports as follows:

" On April 2, 1902, Tidden and Libbey went to the Putnam lot and had a conversation in regard to the building which Tidden said he was intending to erect upon it, in the course of which Tidden told Libbey that he wished him to see Sheehan and then give him, Tidden, an estimate of the cost of such a building. [Another] building known as Stearns Chambers was then under construction just across the street, and Libbey and Dixon were the contractors and Sheehan was the architect. Libbey went to see Sheehan, got the plans and made figures on the cost, and on April 10 or 11 gave Tidden an estimate of $150,000. Tidden then asked him what he would do the mason work, the carpenter work and the roofing for, and Libbey said he would do it for $71,000, to which Tidden replied, 'All right, I will give you the contract.' The amounts and times of payments were not agreed upon, but it was agreed in a general way that they were to be made as the floors went on. It was

also agreed that Libbey and Dixon were to have later what is known as a 'uniform contract,' being the form of contract adopted and recommended for general use by the American Institute of Architects and the National Association of Builders. On April 12, Libbey went to the lot and drove some stakes to indicate where the excavation for the cellar was to be made, and during the time from April 2 to that date he had frequent interviews with Tidden in regard to the building. The first item in his statement of account is a charge of $80 covering these ten days at $8 a day and including the wages of his son and another young man who went to the lot with him and helped him drive the stakes. He did nothing else in reference to the building until June 21, when he sent two carpenters there to put up the permanent batter-boards. On July 16, and on five other days in that month he laid thirty-five thousand brick in the building of cross walls in the cellar, at an estimated cost of $700, the mortar being taken from the mortar beds at the Stearns Chambers job. On August 2 the written contract was signed, and it appears in evidence as 'Exhibit 1.' Mr. Libbey said that there was no particular reason why it was not signed before, although he had spoken to Tidden frequently in regard to it. This contract is written upon the uniform contract blank, and provides that 'the contractor shall and will provide all materials and perform all the work mentioned in the specifications and shown on the drawings prepared by the said architects for the erection and completion of that portion of the work included in the specifications of building of the Putnam Chambers, except cut stone and gas piping.' This contract is claimed by the petitioners to cover all the points mentioned in the conversations between Tidden and Libbey, which resulted in Tidden's saying that he would give him the contract, except that the dates for the payments were fixed. The respondents, on the other hand, claim that the petitioners had no contract before August 2, but only an agreement for, or a promise of, one, and point out that the written contract specifies dates of payments, that the building should be finished by a certain time, that the contractors should allow the owner insurance money, etc., none of which matters were considered or spoken of by the parties when Tidden said that he would give the contract to the petitioners. At that time no agree-

ment was made as to when the petitioners should have possession of the premises, but the written contract provided that they should have possession on or before August 5. When Tidden first spoke to Libbey about the Putnam Chambers he said he had bought the lots on which both that and Stearns Chambers were built, but Libbey said he did not know at that time who had the legal title, but he found out later that Tidden did not have it. . . . Upon the question of whether there was any contract between the parties before April 14, Tidden testified that he made no contract with the petitioners before that date, and had no definite contract with them before August 2, that he wanted them to have the job if they could meet the estimates of other people, but that he did not remember having such a conversation with Libbey on April 12, or that the latter proposed to do the mason and carpenter work and the roofing for $71,000. I find, however, that such a conversation did take place, and that Tidden did say to Libbey that he would give him the job, leaving the question of law as to whether such a contractual relation existed between the parties prior to April 14 as would support a lien for work done before and after that date, for the determination of the court."

It is urged by the respondent that even if Tidden did say to Libbey " All right, I will give you the contract," that was a simple statement of what he intended to do at some time in the future, and was not intended by him or understood by Libbey as a final acceptance of his offer; that at any rate the contract, if even then made, was too vague and indefinite to constitute a basis for a lien. His contention seems to us unsound. It is to be noted that on the very next day Libbey drove stakes to indicate where the cellar excavation was to be made, and that in June and July he did considerable work to the amount of $700, and that it does not appear that there was any agreement about this part of the work except that arising from the conversation of April 11. It is further to be noted that the form of the contract was to be the " uniform contract" well and favorably known to the trade. It is true that the times of the payments to be made as the work progressed were not definitely stated, but it was agreed generally that such payments should be made. The plans had been drawn by Sheehan, and Libbey had seen

them and knew what was to be done. The nature and amount of the mason work, carpenter work and roofing which Libbey and Dixon were to do was known to them and to Tidden. It may be inferred that all the parties were familiar with the business, and with the form of the so-called "uniform contract." The amount of compensation also was agreed upon. In short, the precise nature of the thing to be done and of the price to be paid were fixed. The case is clearly distinguishable from cases like *Parker* v. *Anthony*, 4 Gray, 289, and *Manchester* v. *Searle*, 121 Mass. 418, cited by the respondent. The statements contained in the auditor's report, taken in connection with the inferences reasonably deducible therefrom, warranted the finding of the judge as to the time when the contract was made.

It is urged, however, by the respondent, that even if there was a contract on April 11, it was superseded by the written contract of August 2 ; and in support of this it is said that there are many points of difference between the oral and the written contracts. As illustrations of this difference, the respondent calls attention to the fact that the written contract provided for the erection and completion of that portion of the work included in the specifications for building the Putnam Chambers except cut stone and gas piping, whereas the oral contract was merely for the mason work, the carpenter work and roofing ; that the contractors should finish the work before January 15, 1903, and that possession of the premises should be given to the contractors before August 5, 1902, the oral contract being entirely silent about these matters ; and that it provides for the times and amounts of payments, also for insurance and extra work, none of which were provided for in the oral contract.

But the compensation is the same, and, notwithstanding the difference in the language as to work and labor, it does not appear that the work described in the language of the written contract is any other than, or different from, that covered by the oral contract. Notwithstanding the greater fulness of detail in the writing of August 2, we think that the auditor's report warranted a finding that in all particulars material to this question of a lien, the document was simply the reduction to writing of the oral agreement of April 11 as understood by the parties when made, and that the finding of the court that the writing

was an affirmation of the oral contract and not a substitute for
it is warranted and must stand.

2. The respondent further contends that, as against the mort-
gage under which he claims, the seisin of Tidden was only for an
instant; and that, for that reason alone, if for no other, the lien
of the petitioners, even if valid, never attached to the mortgagee's
interest, but only to the equity of redemption. In other words,
the respondent invokes the aid of the doctrine of instantaneous
seisin. In considering this contention it is well to see what this
doctrine is. The term "instantaneous seisin" is not the best
that could be used to indicate the nature of the doctrine; indeed
it tends to mislead. While it is true that the seisin must be only
for an instant, still that is only one of the essential facts upon
which the doctrine rests. Moreover, the doctrine is not always
applicable where the seisin is only for an instant.

The rule as it appears in the older authorities is chiefly ap-
plied in cases where dower is sought. It is thus stated by Black-
stone: "The seisin of the husband, for a transitory instant only,
when the same act which gives him the estate conveys it also
out of him again (as where by a fine, land is granted to a man,
and he immediately renders it back by the same fine), such a
seisin will not entitle the wife to dower, for the land was merely
*in transitu,* and never rested in the husband; the grant and render
being one continued act. But, if the land abides in him for the
interval of but a single moment, it seems that the wife shall be
endowed thereof." 2 Bl. Com. 132. There is much in this word
"abides." A well known English writer seems to have caught its
meaning when he says it means when the husband "has a seisin
for an instant beneficially for his own use." Preston on Estates,
tit. *Dower,* as cited in Bac. Abr. *Dower,* (C) 2, *in notis.* See also
4 Kent Com. 39; *McCauley* v. *Grimes,* 2 Gill & J. 318; *Stanwood*
v. *Dunning,* 14 Maine, 290; *Gage* v. *Ward,* 25 Maine, 101. When
such is the case, the wife has dower, although the seisin be but
for an instant. A striking illustration of this is found in *Brough-
ton* v. *Randall,* Cro. Eliz. 502, where father and son were seised
in joint tenancy to them and to the heirs of the son, "and they
were both hanged in one cart"; but because the son survived,
"as appeared by some tokens, viz., his shaking his legs," his wife
had dower. Another illustration is where lands descend on a

man who is married, and a stranger enters by abatement immediately after the death of the ancestor. There the wife has dower. Bac. Abr. *Dower*, (C) 2. Doubtless the same principle would apply to a case where the husband, immediately upon receiving a deed of land and paying for it, and not acting merely as a conduit, should convey the land to a third party for a valuable consideration, or should mortgage it to secure a pre-existing debt. Even if all the papers should pass at the same time the wife would be endowed. In such a case the seisin of the husband, although but for an instant, "abides" in him within the meaning of the term as used by Blackstone, or, in other words, is in him "beneficially for his own use."

Quite frequently, however, the seisin, if only for an instant, does not so abide. The most simple case of such a seisin is " where the husband, by the same act, or by the same conveyance, by which he acquires the seisin, parts with it." Parsons, C. J. in *Holbrook* v. *Finney*, 4 Mass. 566, 568. Perhaps the most simple illustration to be found in the older books is where the husband, being a joint tenant, makes a feoffment of his part. Here the wife shall not be endowed because he was sole seised but for an instant. " By the feoffment he was seised of a several estate ' but for an instant, which he acquired and parted with by the feoffment." Parsons, C. J. in *Holbrook* v. *Finney, ubi supra.* Bac. Abr. *Dower*, (C) 2. Co. Lit. 31 b. Where also the husband acts as a mere conduit by which the title passes from his grantor to a third party, the wife is not endowed. A simple illustration of this is where a feoffment be made to B. and his heirs to the use of C. and his heirs, the wife of B. is not endowed because the same feoffment, which gave him the seisin, by the statute of uses transferred it to C., and therefore B. was but a conduit. See *Holbrook* v. *Finney, ubi supra.* Inasmuch as several documents may form parts of one and the same transaction, the doctrine was early extended to cases where the husband upon receiving a deed makes a mortgage back to secure the payment of the whole or a part of the purchase money, *Holbrook* v. *Finney, ubi supra,* and afterwards to cases where, as a part of the same transaction, the mortgage is given to a third party for a like purpose. *Clark* v. *Munroe*, 14 Mass. 351. And in this country the rule is very general that where the husband purchases land and receives a

conveyance of the same, and at the same time executes to the vendor or to some third person who advances the purchase money, a mortgage to secure the payment of such purchase money, the widow, as against such mortgagee, is not entitled to dower. 4 Kent Com. 39. See for collection of the cases, 10 Am. & Eng. Encyc. of Law, (2d ed.) 137.

In this Commonwealth, and quite generally elsewhere, the same doctrine has been extended to the case of liens of mechanics for labor and materials. *Thaxter* v. *Williams*, 14 Pick. 49. *Perkins* v. *Davis*, 120 Mass. 408. *Ettridge* v. *Bassett*, 136 Mass. 314.

It is to be noted that whether the case be one of dower, or lien, (or of a prior judgment in States where a judgment is a lien upon real estate,) it is not sufficient to show that the seisin was only for an instant. That is not the only test. It must further appear that the mortgage, whether given to the original grantor or to a person advancing the purchase money, must be to secure the purchase money or a part thereof. Unless the transaction is in substance and effect one to secure the payment of some part of the purchase money, then the seisin, although but for an instant, is held "beneficially" to the use of the person seised, and the so called doctrine of instantaneous seisin is inapplicable. See *New Jersey Building, Loan & Investment Co.* v. *Bachelor*, 9 Dick. 600.

Under this rule was the seisin of Tidden instantaneous as against this lien? The finding of the trial judge upon this is stated in the following language: "I find that the conveyance to Tidden and his various mortgages, certainly the one under which Skinner [the respondent] claims, were separate transactions, consummated at one time, and not the component parts of one transaction, and that Tidden had not merely instantaneous but actual seisin." We are concerned with this finding only so far as it respects the Skinner mortgage. We understand it to be a finding that, certainly as to that mortgage, the seisin of Tidden was not instantaneous but, to use the language of some of the older books, it was held "beneficially" to himself.

The question whether it was instantaneous must depend upon all the facts and circumstances of the case, and, as before stated, it does not necessarily follow from the fact that the delivery of the instruments was simultaneous, that they constituted

parts of one transaction in which the seisin was instantaneous. *Sprague* v. *Brown*, 178 Mass. 220. The evidence as before stated consisted of the auditor's report and nine exhibits. The respondent argues that the finding is wrong. Before proceeding to the examination of this question, it must be predicated that the question before this court is not whether we should have found as matter of fact upon the evidence as the trial judge found, but whether it can be said as matter of law that the finding of the judge was not warranted by the evidence.

The auditor's report gives in great detail the facts and circumstances bearing upon this question. The following may be regarded as a fair summary of them so far as material.

Some time in February, or before March 17, 1902, one Abbott, who had before acted as Tidden's agent in a similar matter, called his attention to the land in question then owned by Mary A. Putnam, and suggested to him to buy it and build upon it. Tidden said to him that if " he [Abbott] could buy the land, obtain a construction loan and sell or place enough stock in the proposed building he was to go ahead and do so, and he, Tidden, would stand behind the enterprise, and he accordingly gave Abbott full authority to act for him in all of these particulars." Early in March, Abbott, at the office of the Massachusetts Title Insurance Company, saw the respondent Skinner, then its president, and Matlack, its treasurer, and " asked for a construction loan of $80,000." He also told them that " Tidden was to take the title to the property and that he was a man of considerable means." At about this time Tidden had made an agreement in writing with Putnam to purchase this land, but neither Matlack nor Skinner had seen the agreement. At this time Tidden had also made the contract with Sheehan; and the plans which the latter had made for the proposed building were shown to Skinner and Matlack. After further interviews and investigations, Skinner and Matlack said they would accept the loan " provided it should be a first lien on the property." This was about March 17, and Abbott filled out a blank application which Skinner had given to him for that purpose, and the loan was accepted. By the terms of this contract the company was to lend $80,000 for six months, a building was to be erected thereon according to plans and specifications filed with the

company, at an estimated cost of $140,000, and advances were to be made, as therein particularly set forth, as the building progressed. The first advance was to be $50,000, and was to be made " when the building is up to the second floor and floor is on." Nothing is said as to the way in which payment is to be made for the land, although the cost of it is stated to be $37,500. It was simply an agreement for a construction loan, and the various times fixed for the advances of money upon it were fixed solely with reference to the progress of the building.

In this state of affairs Abbott asked Matlack if the company would lend the sum of $17,500 which would be needed to provide for the purchase price, but the latter said that the company would not. Then Abbott asked Matlack if he would not lend it himself, " upon the passage of the papers," and the latter finally agreed to do so upon the condition that " the mortgage ,to be given to him for the loan should be a first lien upon the property, and, as he expressed it, that the operation should be simultaneous, so that the papers would be recorded in this order : First the deed to Tidden, second the Matlack mortgage, and third, the mortgage to the title company; but that all should be recorded at one and the same instant, and Abbott agreed with him that so far as his mortgage was concerned the taking of the title by Tidden and the making of the mortgage should be all one and the same transaction." It was also agreed between Abbott and Matlack " that the money was to go to the vendor and was to be treated as a part of the $80,000 loan to be paid back to him by the company out of the first payment of $50,000." Abbott also spoke of a mortgage of $22,000 held on the property by the Union Institution for Savings, which was to be assumed by Tidden, and it was agreed between himself and Matlack that the title company should assume and pay it, but that it should remain until Tidden should ask to have it paid. This mortgage was dated April 29, 1901, and was to run for three years. It was in fact paid and discharged on November 11, 1903, as a part of the $50,000 advance.

Meanwhile the title had been examined by the company and three mortgages had been prepared by the company, one to Matlack for $17,500, one to the company for $80,000, and a third to one Shawhan for $50,000. Nothing was ever advanced

on the Shawhan mortgage, and its existence is immaterial to the case. These mortgages were all executed by Tidden, who was the mortgagor in each of them, in the forenoon of April 14, 1902. The date of the mortgage to Matlack was April 5, 1902, "which was probably the day when he agreed to lend the $17,500, and was so dated because the interest was to begin to run then." The mortgage to the company was dated March 17, 1902, "because that was the date of the acceptance of the application for the loan, and the interest was to run from that day." The deed from Putnam to Tidden was signed also in the forenoon of April 14, 1902.

These various papers were all delivered about three o'clock in the afternoon of April 14, 1902, at the registry of deeds. At that time there were present one Stevens, who was acting for the company, Abbott, who was acting for Tidden, and one Davis, who was acting for Miss Putnam. Davis handed to Stevens for examination the deed from Miss Putnam, and also two other deeds giving her title to a strip of land adjoining her own estate. The auditor describes the further proceedings as follows:

"Mr. Stevens then produced three checks — one for $4,000, another for $12,577.73, and a third for $922.27, drawn by the Massachusetts Title Insurance Company to the order of Edward Miles Abbott, and all dated April 14, which he delivered to Abbott upon Tidden's written order to that effect. These checks having been examined by Abbott and by Davis, and Stevens having found the Putnam deeds to be in proper form, and having run down the title from April 6, the date to which his previous examination had brought it, the transaction was then carried out. Abbott indorsed the check for $4,000 to the order of John G. Stearns, the grantor of Miss Putnam, and the check for $12,577.73 to the order of Mary A. Putnam, and the deeds were delivered to Mr. Stevens by Mr. Davis. Mr. Stevens then numbered the papers consecutively as follows:

"1. Deed from Stearns to Stearns; 2. Deed from Stearns to Putnam; 3. Deed from Putnam to Tidden; 4. Mortgage from Tidden to Matlack; 5. Mortgage from Tidden to Massachusetts Title Insurance Company; and 6. Mortgage from Tidden to Shawhan; and handed them to the assistant register, and instructed him to put them on record at one and the same moment,

which was done accordingly, and they all appear to have been recorded at eight minutes after three o'clock on April 14, 1902. Mr. Stevens said that nothing was said about an instantaneous seisin, but that he told Abbott that Tidden was to have title subject to the mortgages in the order named."

The mortgage to Matlack was due in three months from its date, and was subject to the prior mortgage held by the Union Institution for Savings. The mortgage to the company was due in six months from its date, and contained covenants of warranty and against incumbrances. Subsequently it was agreed between Matlack and the company that Matlack should adopt the whole transaction; and on November 7, the $80,000 mortgage was assigned to him. Owing to delays in the construction of the building, the first advance of $50,000 was not made until November 4. It has been stated that the $22,000 due to the Union Institution for Savings and the $17,500 due on the mortgage to Matlack should be charged to this payment; and this was accordingly done. The Matlack mortgage was discharged October 9, and the discharge recorded on November 6, 1902.

These are the main features of the evidence bearing on this issue. The judge might properly have found upon the whole evidence that Tidden desired to accomplish two things, one being to get the title to the land and the other to get a construction loan, and that each transaction was separate from the other. It is certain that Miss Putnam the vendor had no interest in the manner in which Tidden obtained the money to pay for the land, and that she had nothing to do with it. The court might have found also that the company did not intend to pay any part of the purchase money as such. It had refused to advance any money for that purpose, and Matlack advanced it. It is true that when the time came for the first advance of $50,000 on the construction mortgage there were to be credited to the company as a part thereof the sums due on the Matlack mortgage and the mortgage held by the Union Institution for Savings, but these mortgages were each to be discharged, and the judge may well have found that these credits which were to be made upon this first advance were not to be regarded as payments of the purchase money as such, but rather as sums which under the covenants in the construction mortgage it was the duty of

Tidden finally to pay. The evidence tended to show that in receiving these credits the company did not intend in any respect to be subrogated to the rights of Matlack or the savings institution, but that on the contrary it relied solely upon its rights under the construction mortgage, and this too although the company had agreed to assume and pay the mortgage held by the savings institution. Without further discussing the matter, we think that the finding of the trial judge upon this branch of the case was warranted by the evidence.

3. ·The respondent further contends that, even if Tidden's seisin was not instantaneous, the lien cannot attach to his interest under the mortgage. This contention is based upon the fact that, at the time the contract with the petitioners was made, Tidden was not the owner, nor was he rightfully acting for the owner. It is argued by the respondent that Tidden, after he became the owner, could not adopt or ratify any antecedent contract so as to interfere with the rights of an intervening mortgagee. The argument is well put in the respondent's brief in the following language:

" The lien law requires a contract with the owner; at the time of the deed to Tidden, and the mortgage to the insurance company, the petitioners had no contract with the owner. Tidden could, by adopting and ratifying the contract, as he subsequently did do, give to Libbey and Dixon a right to lien his interest for the amount of the entire contract; but he could not prejudice the rights of the mortgagee who took the property when it was not subject to any lien. At the moment when the deed to Tidden and the several mortgages were delivered the petitioners did not have a contract with the owner. The owner before the delivery of the deed was Mary A. Putnam. When Tidden became the owner, he, as owner, had no contract with the petitioners. He could by some act, by adoption or ratification or acquiescence in the performance of work under the contract, ratify the entire contract so that the petitioners would have a right to a lien under the entire contract as against Tidden's, the owner's, interest at the time when the contract was ratified. But it has never been held or intimated that the mere previous existence of a contract with one who subsequently became the owner, allowed the contractor to have a right to a lien

at the moment the other party to the contract became the owner. There must be some act of the owner sufficient to cause a ratification of the contract. In the present case the owner, Tidden, did absolutely nothing, and could have done absolutely nothing, in ratification or confirmation of the petitioners' alleged contract with him between the time when Tidden became owner and when he conveyed away the several mortgage interests. At the time when the mortgage under which the respondent claims was recorded there was no existing contract with the owner of the premises. The ratification by Tidden could not, as was said before, be construed as a ratification against the previously existing rights of mortgagees."

The respondent cites *McDowell* v. *Rockwood*, 182 Mass. 150, and *Rochford* v. *Rochford*, 188 Mass. 108, as exactly in point. By an examination of the papers in the first of these cases, it appears that the mortgagee had advanced a large part of the purchase money and the mortgage was given to him in part to secure him for such advance. The case was therefore one of instantaneous seisin; and there can be no doubt that in such a case the mortgagee takes the title and succeeds to the rights of the owner. In the language of Knowlton, J. in that case, " The mortgagee takes the property as he finds it. If there is an existing lien upon it, it can be enforced, notwithstanding his mortgage. If there is a contract right, under which, as against the owner, the claimant can go on and create a lien without further action, recognition, or concession by the owner, the mortgagee takes subject to it. But the mortgagee takes the owner's legal title and succeeds to his rights. After the mortgage is made, the owner, as against the mortgagee, can do nothing to create a lien. ' The contract under which the lien is claimed ' [R. L. c. 197, § 5] is not effectual to create a lien against the mortgage, if it requires, to give it efficacy, a subsequent act of acceptance or recognition." p. 154. *Rochford* v. *Rochford* was also a case of instantaneous seisin. It appears in the report that " the delivery of the deed and that of the mortgage were simultaneous and part of the same transaction." As applied to such a case the mortgagee succeeds to the rights of the original owner, and the mortgagor, the new owner, whether or not he be the person who contracted for the labor and materials, cannot

hurt the interest of the mortgagee.  The seisin is not in him
" beneficially."   Strictly speaking, such a case does not turn on
ratification.

*Courtemanche* v. *Blackstone Valley Street Railway*, 170 Mass.
50, was a case however which turned upon the question of rati-
fication.   It is to be noted however that in, that case the party
which contracted for the labor and materials was not the owner
at the time of the contract, and never became the owner.   That
is the reason why it was necessary to the maintenance of the
lien that there should have been ratification by the defendant
after it became the owner.

The true rule is that in cases of instantaneous seisin within
the meaning of that term as used in this connection the mort-
gagee succeeds to the rights of the former owner, and where at
the time of the latter's conveyance there is no lien against him
there is none against the mortgage, and that is so whether the
second owner undertakes to ratify or not.   The rights of the
mortgagee in no respect are affected by the second owner's rati-
· fication.   The true cases of ratification are where the person
who becomes the owner was not one of the parties to the origi-
nal contract under which the lien is claimed.

The present case is not one of instantaneous seisin, nor is it
like *Courtemanche* v. *Blackstone Valley Street Railway, ubi supra.*
Tidden made the contract and was bound by it.   He was none
the less bound by it when he became the owner.   The tie was
the same all the way through.   There was no instant when he
was not bound by it.   Why speak of the ratification of one's
own contract?   As in such a case the right of dower would have
attached to the land free of any mortgage, so upon the same
principle the right to a lien under the contract attached to it
free of mortgage.   Tidden was both contractor and owner the
instant he became seised, and, his seisin not being instantaneous,
the contract in law precedes the mortgage.   And the lien ex-
tends as well to the labor and materials furnished before the
deed was delivered as to those furnished afterwards.   *Courte-
manche* v. *Blackstone Valley Street Railway, ubi supra.*   See
also *Sprague* v. *Brown*, 178 Mass. 220 ; *Osborne* v. *Barnes*, 179
Mass. 597.   There being a lien for whatever was due under the
contract, there is no occasion to consider the law which would

be applicable if the contract was entire for an entire price and there could be a lien only for a part.

The conclusion to which we have thus come renders it unnecessary to consider the other objections raised by the respondent, since they become immaterial. We see no error in the manner in which the judge dealt with the case. As to the petitioners the exceptions are overruled.

4. The case of Sheehan, the intervening petitioner, however, is different. He was to receive $2,500 for preparing plans and specifications and supervising the erection of the building. This was an entire contract for an entire price. There is no lien for the work of preparing the plans and specifications. *Mitchell* v. *Packard*, 168 Mass. 467. The general rule under our statute is that where there is an entire contract and there is no lien for one part there can be no lien for any part. This rule has been most frequently applied where both labor and materials were furnished under an entire contract and for want of notice to the owner no lien existed for the materials. In such cases it early was held that there was no lien for the labor. *Morrison* v. *Minot*, 5 Allen, 403. *Graves* v. *Bemis*, 8 Allen, 573. St. 1872, c. 318, § 1, (R. L. c. 197, § 2,) changed the law as to certain contracts, but it is clear that this contract is not within that statute. Nor is it within R. L. c. 197, § 16. That section plainly applies to contracts where a lien would have existed if the contract had been completed.

The agreement was made by the parties. They did not see fit to come to any agreement as to apportionment, and we cannot make a new contract for them, but must take it as made, an entire contract for an entire price ; and there is no principle upon which we can apportion it. There being no lien for one part there can be no lien for the other. It follows that as to Sheehan, the intervening petitioner, the exceptions must be sustained.

> *Exceptions, so far as they respect the petition of Libbey and Dixon, overruled ; so far as they respect the petition of Sheehan, sustained.*

*A. Hemenway*, (*A. E. Burr* with him,) for the respondent Skinner.

*F. L. Norton*, for the petitioners.