[No. 23334.   Department One.   December 14, 1931.]

J. J. BERGER, *Respondent,* v. ANNIE BAIST *et al., Appellants.*[1]

[1]Reported in 6 P. (2d) 412.

*Roberts, Skeel & Holman* and *Wm. Paul Uhlmann,* for appellant Annie Baist.

*Guy B. Knott,* for appellant Preston Lumber & Supply Co.

*Chas. M. Fouts,* for respondent.

BEELER, J.—We shall refer to the appellant Annie Baist as "Baist", to the appellant Preston Lumber & Supply Company as "Company", and the respondent, J. J. Berger, as "Berger."

The case between Baist and Berger presents a contest for priority between them as assignees from a common assignor and vendor of *different* mortgages covering *substantially* the same real property. These parties are in agreement as to the facts, the questions in dispute between them being questions of law.

The case between the Company and Berger presents a contest for priority between the holder of a materialman's lien and an assignee of a mortgage. These parties are in dispute both as to the facts and the law.

Baist appealed from that portion of the decree which adjudged her mortgage inferior and subsequent to the mortgage of Berger. The Company appealed from that portion of the decree which adjudged its lien inferior and subsequent to the mortgage of Berger.

A detailed review of the facts is necessary.

Twenty-seventh avenue extends north and south, and crosses east Pine street, which extends east and west, being public streets within the corporate limits of the city of Seattle. On December 13, 1928, one T. G. Stafne, a bachelor, owned a parcel of unimproved real estate situated at the northeast corner of the intersection of the above named streets, described as lots 1, 2, and 3, block 14, Yesler's Second Addition to Seattle, King county, Washington. These lots front

on Twenty-seventh avenue, are sixty feet wide and one hundred and twenty feet deep, the entire tract embracing an area of 180 x 120 feet—*180 feet on Twenty-seventh avenue and 120 feet on east Pine street*. On December 13, Stafne mortgaged the west 60 feet of lot 1, and the west 60 feet of the south 30 feet of lot 2, being a tract 90 x 60 feet—*90 feet on Twenty-seventh avenue and 60 feet on east Pine street*—and being a portion of the hereinabove described larger tract, to the Northern Bond & Mortgage Company, to secure a loan of $2,800. This mortgage was filed for record December 17, 1928, and on the same day was assigned by the Northern Bond & Mortgage Company to Baist, but she failed to place her assignment of record until December 24, 1929.

On April 16, 1929, Stafne conveyed this 90 x 60 tract, together with an additional ten-foot strip contiguous to and along the easterly boundary thereof, to the Enterprise Building Company, a corporation, owned and operated by himself and his brother, the company being engaged in the construction of houses for sale. A few days later, the Enterprise Building Company began to excavate at about the center of this tract preparatory to the erection of a dwelling, and ordered from the Company a load of building materials for use in the contemplated structure, which materials were delivered on April 27, 1929.

Subsequent to that delivery, the Enterprise Building Company, without any notice to the Company, changed its plans and stopped excavation at that particular point, and concluded to erect two houses in lieu of one. To this end, the mortgaged tract (90 x 60), together with the added ten-foot strip contiguous and to the east thereof, were divided into two parts or lots each measuring 45 x 70 feet; and on May 11, 1929, the Enterprise Building Company mortgaged each of these

tracts or lots to the Northern Bond & Mortgage Company, which mortgages were filed for record May 13, 1929. The mortgage on the corner tract (45 x 70) and referred to in the record as "1600 Twenty-seventh avenue," was assigned by the Northern Bond & Mortgage Company to Berger July 10, 1929, and the assignment filed for record July 12, 1929.

Building permits were procured on May 14, 1929, for the erection of these two houses. The materials delivered on April 27, 1929, and subsequent deliveries were used in the erection of the house at 1600 Twenty-seventh avenue, and the Company, at the completion of the work, perfected its lien thereon.

On the trial in the lower court, it was stipulated that Baist and Berger purchased their respective mortgages in good faith, for value, and that Berger, at the time he procured his assignment, was assured by the Northern Bond & Mortgage Company that the mortgage transferred to him was a first and prior lien on the premises, and that Berger had no *actual* knowledge of the existence of the prior mortgage or of its assignment to Baist.

We shall first take up the controversy between Baist and Berger.

It must be borne in mind that the Baist mortgage covered a tract (90 x 60 feet) situated on the northeast corner of the street intersection—*90 feet on Twenty-seventh avenue and 60 feet on east Pine street,*—and the Berger mortgage covered a tract (45 x 70 feet)— *45 feet on Twenty-seventh avenue and 70 feet on east Pine street,* 45 x 60 feet thereof being a portion of the identical property covered by the mortgage assigned to Baist. Berger recorded his assignment July 12, 1929, while Baist recorded her assignment December 24, 1929; so the question between these parties is whether the failure of Baist to record her *assignment*

until after Berger had recorded his *assignment* subordinated her mortgage to the latter's mortgage.

It is the settled law of this state that, where the owner and record holder of a mortgage on real estate sells and assigns the *same* mortgage to two different purchasers, each being a purchaser for value, in good faith, and without notice, the one first recording his assignment acquires a prior right. *Erickson v. Kendall,* 112 Wash. 26, 191 Pac. 842; *Price v. Northern Bond & Mortgage Co.,* 161 Wash. 690, 297 Pac. 786. These decisions are based upon the theory that a purchaser of a recorded mortgage, of which there is no assignment of record, has a right to assume that no such assignment has been made.

But in this case, although the vendor was the same, the mortgages *assigned* were not. Generally speaking, a mortgage, as soon as it is recorded, acquires priority which cannot be affected by any subsequent conveyance or incumbrance of the mortgaged property.

"Priority once gained can not be lost. The registry of a deed or mortgage is equivalent to a notice of it to all persons who may subsequently become interested in the property, and fully protects the grantee's rights. A mortgage having once obtained priority by record does not lose its place by being held by anyone under an unrecorded assignment." 1 Jones on Mortgages (8th ed.), § 645, p. 926.

Manifestly, the mortgage acquired by Berger July 10, and recorded July 12, was, while held by the Northern Bond & Mortgage Company from May 11 to July 10, subordinate to the first mortgage assigned to Baist December 17, 1928, even though her assignment was not filed for record until December 24, 1929.

Did Berger, by reason of the assignment to him, acquire any greater rights than his vendor had? We think not. In *Gillig v. Maass,* 28 N. Y. 191, Maass and

wife, on November 6, 1851, executed a real estate mortgage to Walber. On November 8, 1851, Walber assigned this mortgage to Mrs. Maass, one of the mortgagors. The assignment was not placed of record until November 21, 1853. In the meantime, on February 14, 1852, Walber, the first mortgagee, entered into a written agreement with one Jones, whereby it was stipulated that Walber's mortgage should become junior and inferior to any mortgage "that said Maass and wife might hereafter execute to said Jones," and "such mortgage hereafter to be made and executed in favor of Jones shall always have preference before said mortgage to Walber." On February 18, 1852, Maass and wife executed a mortgage to Jones on the same premises. Mrs. Maass had no knowledge or notice of, nor was she in any way privy to, the agreement between Walber and Jones. Discussing the question of priority, that court said:

"Her assignment was not placed upon record until some two years afterwards; nor was it necessary in order to protect herself against a subsequent mortgage or conveyance from Maass, for the recording statutes only apply to *successive purchasers* from the same sellers, (*Raynor v. Wilson*, 6 Hill, 469), and the record of the assignment of the mortgage would only be constructive notice of such assignment, as against subsequent assignees of the mortgagee. (*N. Y. Life Ins. Co. v. Smith*, 2 Barb. Ch. R. 82) The omission to record it would be no fraud upon a junior mortgagee, nor estop her from setting up her claim to defeat his mortgage."

In *Greene v. Warnick*, 64 N. Y. 220, the same question was before the New York court of appeals. It was there said:

"But the only effect of recording an assignment of a mortgage is to protect the assignee against a subsequent sale of the *same mortgage*. If the assignment

be not recorded, the assignor can assign to another person, a purchaser in good faith, and for value, who may record his assignment first, and will then hold the mortgage against the first assignee. An assignment is a conveyance of the mortgage which, within the recording act, is a chattel real and such conveyance, not recorded, is void against any subsequent purchaser 'of the same real estate,' to wit, *the same mortgage.*" (Itálics ours.)

See, also, *Curtis v. Moore,* 152 N. Y. 159, 46 N. E. 168, 57 Am. St. 506; *Campbell v. Vedder,* 3 Keys (N. Y.) 174.

In the case of *Miller v. Fryberg,* 119 Wash. 243, 205 Pac. 388, this court announced the same rule. We there held that an assignment of a mortgage, the mortgage having been given to a contractor to cover the cost of constructing a house to be built on the premises, had priority over claims of lien for material furnished to the contractor after the recording of the mortgage, even though the assignment was not recorded.

Our recording act, in part, provides:

"(1) The term 'real property' as used in this act includes lands, tenements and hereditaments and chattels real and *mortgage liens* thereon except a leasehold for a term not exceeding two years.

"(2) The term 'purchaser' includes every person to whom any estate or interest in real property is conveyed for a valuable consideration and every assignee of a mortgage, lease or other conditional estate.

"(3) The term 'conveyance' includes every written instrument by which any estate or interest in real property is created, transferred, mortgaged or assigned or by which the title to any real property may be affected, including an instrument in execution of a power, although the power be one of revocation only, and an instrument releasing in whole or in part, postponing or subordinating a mortgage or other liens; except a will, a lease for a term of not exceeding two years, an executory contract for the sale or purchase of land,

and an instrument granting power to convey real property as the agent or attorney for the owner of the property. 'To convey' is to execute a 'conveyance' as defined in this subdivision." (Italics ours.) Rem. 1927 Sup., § 10596-1.

"A conveyance of real property, when acknowledged by the person executing the same (the acknowledgment being certified as required by law), may be recorded in the office of the recording officer of the county where the property is situated. Every such conveyance not so recorded is void as against any subsequent purchaser or mortgagee in good faith and for a valuable consideration from the same vendor, his heirs or devisees, of the same real property or any portion thereof whose conveyance is first duly recorded. An instrument is deemed recorded the minute it is filed for record." Rem. 1927 Sup., § 10596-2.

The New York recording act, § 291, McKinney's Consolidated Laws of New York, Book 49, p. 342, provides:

"RECORDING OF CONVEYANCES. A conveyance of real property, within the state, on being duly acknowledged by the person executing the same, . . . may be recorded in the office of the clerk of the county where such real property is situated, . . . Every such conveyance not so recorded is void as against any subsequent purchaser in good faith for a valuable consideration, from the *same* vendor, his heirs or devisees, of the *same* real property or any portion thereof, whose conveyance is first duly recorded." (Italics ours.)

Thus it will be seen that the New York recording act is quite similar in its provisions to our section 10596-2; consequently the decisions of the New York courts construing the recording act as applied to *unrecorded mortgage assignments* are entitled to considerable weight. The supreme court of New York, in the case of *First National Bank of Sodus v. Conant et al.*, 112 Misc. Rep. 663, 183 N. Y. Supp. 683, reviewed the earlier decisions on this question. In that case, the

owner mortgaged certain real property to Conant, who assigned to Gaylord. Neither the mortgage nor the assignment were recorded until after the owner had mortgaged to Kelly, whose mortgage was recorded and assigned to the bank. The court there adhered to the rule previously announced that the recording act applied to the recording of the mortgage, but had no application as between *assignments* of *different* mortgages. The court said:

"The transaction brings the case within the recording act, and makes the Herman L. Kelly mortgage a prior lien to the unrecorded mortgage. This being so, the assignment to the bank, whether recorded or not, takes priority over the subsequently recorded senior mortgage to Chester W. Conant and its assignment to defendant Gaylord. The lien of the Herman L. Kelly mortgage could not be affected by the failure to record the assignment to the bank, and the recording of the Kelly assignment subsequent to the recording of the Conant assignment is immaterial. . . . The recording act applies as between the two mortgages, but not as between the *two assignments,* since they are not assignments of the *same mortgage."* (Italics ours.)

"Real estate," as defined by § 10596-1, *supra,* includes *mortgage liens.* The mortgage lien acquired by Baist under her assignment was a separate and *different* interest in the real property from the mortgage lien created by the second mortgage acquired by Berger, and hence our recording act has no application.

In the present case, the record gave Berger notice of the prior mortgage on the premises in question, and which was assigned to Baist. It was his duty, in the exercise of proper diligence, to ascertain if his vendor was still the owner of that mortgage, and, if so, see that it was discharged of record, and his omission to do so deprives him of the protection of a bona fide pur-

chaser. Had the Northern Bond & Mortgage Company *satisfied* the record of the mortgage which it had previously assigned to Baist, and which assignment she failed to file for record until December 24, 1929, or sold the *same* mortgage to Berger, he would have acquired, if he acted in good faith, priority as contemplated by our recording act. The Northern Bond & Mortgage Company, however, did not satisfy the prior mortgage, and did not sell to Berger the *same* mortgage, but an entirely *different* mortgage, which distinguishes the instant case from the *Erickson* and *Price* cases, *supra,* relied on by the respondent.

When the respondent purchased his mortgage, he was charged with constructive notice of the prior recorded mortgage, and of its priority notwithstanding the fact that the *assignment* of the prior mortgage to Baist was not of record. The failure of Baist to record her assignment until December 24, 1929, worked no fraud on Berger. Even if she had promptly recorded her assignment, it would in no manner have afforded Berger any additional protection against the fraud practiced against him by the Northern Bond & Mortgage Company. Had Berger examined the record, he would have discovered the mortgage executed by Stafne and which was filed for record December 17, 1928. His failure so to do led to his misfortune, for which Baist is in no manner to blame.

So far as the question of estoppel is concerned, it is sufficient to say that the elements of estoppel *in pais* are entirely lacking. Baist was not a party to the transaction between Berger and the Northern Bond & Mortgage Company and its acts or statements can not bind or estop her.

Turning now to the controversy between Berger and the Company.

Section 1147, Rem. Comp. Stat. provides as follows:

"The provisions of law relating to liens created by this chapter, and all proceedings thereunder, shall be liberally construed with a view to effect their objects."

Lien laws are generally given liberal construction by the courts of foreign jurisdiction, as well as by this court.

"It is sufficient for us to say that, whatever may be the conflicting decisions of other tribunals, we are of the opinion that no narrow or limited construction of our mechanic's lien law should be indulged in by the courts, and that the labor and industry of the country should not be hampered by technicalities or harsh interpretations of what was evidently intended to be a just law for the benefit of our industrial pursuits, which tends so materially to the building of cities and towns, and is the embodiment of so much natural justice. He whose property is enhanced in value by the labor and toil of others should be made to respond in some way by payment and full satisfaction for what he has secured. To accomplish this result is the intent of the lien law." *Emery v. Hertig,* 60 Minn. 54, 61 N. W. 830.

Berger takes the position that the Company's lien is subordinate to his mortgage, for the reason that the structure which the Enterprise Building Company first started to erect at the corner of Twenty-seventh avenue and east Pine street was abandoned and another structure or dwelling erected within a few yards to the south thereof. This contention is based upon the theory that, in order to establish a right to a materialman's lien, the material must be furnished to and used in a certain specified building, and that any change in construction or location will defeat the right. Rem. Comp. Stat., § 1129, in part, reads:

"Every person performing labor upon or furnishing material to be used in the construction, alteration

or repair of any . . . building, . . . or any other structure . . . has a lien upon the same for the labor performed or material furnished by each, respectively.''

Section 1132, Rem. Comp. Stat., in part, reads:

''The liens created by this chapter are preferred to any lien, mortgage or other encumbrance which may attach subsequently to the time of the commencement of the performance of the labor, or the furnishing of the materials for which the right of lien is given by this chapter . . .''

Section 1129, Rem. Comp. Stat., provides for a lien in favor of anyone furnishing materials to be used in the erection of any building and contemplates something more definite than the furnishing for general or unknown purposes, or a sale in the usual course of trade, or a sale without reference as to what shall be done with the materials sold. This does not mean, however, that the materialman must, at his peril, ascertain the exact spot on the premises where the building is to be erected, or the size or shape of it, or that his right of lien may be affected by any change in the location of the building after he has commenced furnishing materials therefor.

''We think that the contractor may fairly be regarded as furnishing materials for a particular building, when he knows that they are to go into a building, although he may not at the time of making the contract know the location, character or ownership of the building into which they are to go. Especially we think he may be regarded as furnishing the materials for the particular building, where each load is delivered at the building, and where, at the time of each successive delivery, he is cognizant of the location and identity of the building at and for which the materials are delivered.'' *Schulenberg & Boeckler Lumber Co. v. Johnson,* 38 Mo. App. 404.

See, also, *Smith v. Chicago Lumber & Coal Co.*, 114 Pac. (Kan.) 372.

In the present case, the owner of the premises ordered materials from the company for use in the construction of a building on particular premises situated at Twenty-seventh avenue and east Pine street, in the city of Seattle; the building was constructed on these premises; the first delivery of materials was made on April 27, 1929; each successive delivery was made at substantially the same place; and all of the materials so furnished were used in the construction of the house on the corner of these premises. The fact that the Enterprise Building Company, after the materialman had made its first delivery of materials, changed its plan to construct but one house as originally contemplated, and instead thereof erected two houses, in no wise alters or affects the legal status of the question here involved, nor can it defeat the lien of the Company. 40 C. J. 88.

The materials delivered all went into the erection and construction of the house on the 45 x 70 foot tract which, excepting the easterly ten feet thereof, was a part of the 90 x 60 foot tract on which it was originally contemplated to build but one house. The first delivery on April 27, 1929, occurred prior to the giving of the mortgage of May 11, and which was filed for record May 13, and assigned to Berger July 10, 1929, and under which he claims. Since the Company's lien was established at least two weeks prior to the time the mortgage of May 11 was executed and filed for record, it follows that the Company's lien is entitled to priority.

The judgment appealed from is reversed both as to Baist and the Company, with instructions to give the appellant Annie Baist under her assignment of mortgage, and the Preston Lumber & Supply Company,

under its lien, priority over the mortgage of the respondent J. J. Berger.

TOLMAN, C. J., PARKER, MITCHELL, and HERMAN, JJ., concur.