[No. 25217. Department One. November 21, 1934.]

ARTHUR G. DUNN, JR., as *Trustee, Appellant,* v. ANNA GERTRUDE NEU *et al., Respondents,* RAYMOND E. HIGGS *et al., Defendants.*[1]

[1]Reported in 37 P. (2d) 883.

352

*Allen, Froude & Hilen, Hovey & Anderson,* and *Byers, Westberg & James,* for appellant.

*Roberts & Skeel, Tyre H. Hollander, Philip D. Macbride,* and *George W. Williams,* for respondents.

TOLMAN, J.—This is an action brought to foreclose a real estate mortgage which resulted in a decree denying foreclosure, but granting a personal judgment in the amount due against the maker of the notes secured by the mortgage. The plaintiff has appealed, and by the error assigned, questions that part of the decree which denies foreclosure.

The facts are not seriously in dispute, but the parties widely differ as to the inferences to be drawn and the law to be applied. This necessitates a somewhat extended statement of the basic facts.

It appears that, prior to his death in 1917, August Mehlhorn, Sr., was in the control and management of the corporation known as Osner & Mehlhorn, Inc., and built up that concern so that it was generally regarded as a substantial, solvent and successful business institution. That reputation continued practically . unmarred until the disappearance of August Mehlhorn, Jr., in September, 1930, and the consequent revelation of his many defaults, the history of some of which appears in various opinions of this court. August Mehl-

horn, Sr., died possessed of large and valuable real estate holdings in Seattle and elsewhere, the principal properties in Seattle being known as the Union Block, the Ramshorn Building and the Mehlhorn Building.

Upon the death of August Mehlhorn, Sr., his son, August Mehlhorn, Jr., and his daughter, Anna Gertrude Neu, inherited each an undivided one-half interest in his estate. They were named as joint executors of his will, and after the estate was probated August Mehlhorn, Jr., continued to act as the sole manager of this undivided real estate on his own behalf and on behalf of his sister. During the time he so managed the property and until about the end of the year 1927, he made regular periodical reports of his management to Mrs. Neu and accounted to her for her one-half of the income of the various properties. Beginning with 1928, and until some time in the year 1930, August Mehlhorn, Jr., neglected and failed to account to his sister or to pay to her any part of the income derived from the property. This led to efforts upon her part to secure an adjustment, resulting in an agreement hereinafter referred to.

It appears that, even before the death of August Mehlhorn, Sr., a strained relationship existed between August Mehlhorn, Jr., and his sister, Mrs. Neu, and although the two families resided next door to each other for many years, yet after the death of August Mehlhorn, Sr., personal relations between them seemed to have practically ceased, they did not visit one another, meet socially, exchange presents, or maintain any of the usual family relations. Mrs. Neu did go to her brother's office upon occasions, apparently for purely business reasons, and it seems to have been apparent to all who had occasion to observe them that these visits were for business reasons only, and that the personal relationship was cool and distant. Mrs. Neu

was in no wise familiar with the business affairs of Osner & Mehlhorn, had no interest in that business, and knew nothing of its affairs other than what was known to the general public.

While the matter of the partition of the real estate seems to have been considered, at least by Mrs. Neu, prior to that time, yet she made no demand upon August Mehlhorn, Jr., for a partition until the fall of 1929, when he assented to the idea, but failed to do anything. Apparently as early as the beginning of the year 1930, by reason of the failure of August Mehlhorn, Jr., to act in the matter of a partition, and by reason of his failure to account to her, Mrs. Neu employed an attorney to act for her in securing a settlement and a partition.

This attorney, acting on behalf of Mrs. Neu, made demands upon August Mehlhorn, Jr., which finally resulted in an agreement dated June 17, 1930, executed by Mrs. Neu and August Mehlhorn, Jr., by the terms of which Mrs. Neu agreed to submit in writing to Mehlhorn within five days a proposal dividing the property into two groups, each to be free and clear of liens and encumbrances except non-delinquent installments of special assessments, and excepting, also, a mortgage of $52,500 on the Mehlhorn building to be assumed by the party accepting title thereto. The agreement gave Mehlhorn five days within which to accept either of the lists, as he might elect, in lieu of his undivided one-half interest in all of the property; Mrs. Neu, of course, to accept the other group in lieu of her undivided one-half interest in the whole. By the agreement, Mehlhorn was to convey to Mrs. Neu by warranty deed the properties contained in the list not accepted by him, and she likewise to convey to him by warranty deed her interest in the property selected by him; the deeds to be

delivered to the Washington Title Insurance Company, as escrow holder.

By the agreement, Mehlhorn warranted that there were no mortgages, liens or encumbrances whatsoever against any of the property except the known mortgage on the Mehlhorn building. Within sixty days from the execution of the deeds, Mehlhorn was to pay and discharge all tax liens against the property which he conveyed to Mrs. Neu and all installments of special assessments then delinquent, and also to discharge all other liens and encumbrances whatsoever against the properties so conveyed. Also, within the sixty day period, Mehlhorn was to pay to Mrs. Neu five thousand dollars in cash in full settlement of her half of the income due her up to June 30, 1930.

The properties were appraised by a reputable real estate broker, were divided into two groups of as near equal value as possible, and the list submitted to Mehlhorn. Mehlhorn also employed a broker, who appraised the properties, and who approved the two lists as being as nearly of equal value as possible. Group No. 1 contained the Mehlhorn building, while the Ramshorn building was placed in group No. 2. August Mehlhorn, Jr., selected group No. 1, headed by the Mehlhorn building. Deeds were executed in accordance with the terms of the agreement, and placed in escrow with the Washington Title Insurance Company as escrow holder; and it became the duty of the escrow holder to ascertain any changes in the record title affecting any of the properties in question subsequent to the entry of the decree of distribution in the estate of August Mehlhorn, Sr.

A title search was made by the escrow holder, which revealed that, on July 5, 1928, August Mehlhorn, Jr., had conveyed his undivided one-half interest in the Ramshorn building to one Raymond E. Higgs, a bach-

elor; that, on the same day, Higgs had executed and delivered a mortgage upon the property, so conveyed to him, to Osner & Mehlhorn, Inc., to secure the payment of thirty promissory notes amounting to the sum of forty thousand dollars; and that, immediately following the execution of the mortgage, Higgs had deeded the property back to August Mehlhorn, Jr. Mrs. Neu first learned of the existence of this mortgage when so advised by her attorney shortly after the title search was made.

An officer of the escrow holder made inquiry of Mr. Mehlhorn in regard to this mortgage, and was advised that it had been fully paid, and would be immediately satisfied of record. A written satisfaction was asked for, and that not having been received, the same officer, a few days later, again asked Mr. Mehlhorn for such a satisfaction. To this, Mehlhorn replied that the mortgage had already been satisfied of record, whereupon the record was examined and it was found that a marginal satisfaction of the mortgage had been entered of record by Mr. Mehlhorn, signing as secretary of Osner & Mehlhorn, Inc., the mortgagee; this marginal satisfaction being dated July 17, 1930.

It being the policy of the escrow holder to require from corporations a written satisfaction executed by two officers, Mr. Mehlhorn was again approached for the purpose of securing such a written satisfaction, whereupon Mehlhorn advised the escrow holder that he was the only officer of the corporation and the sole owner of all of its capital stock. At the request of the escrow holder, Mr. Mehlhorn executed and delivered a written affidavit reciting that he had satisfied the mortgage as secretary of Osner & Mehlhorn, Incorporated, and that he was the only officer of that corporation and the sole owner of its capital stock.

With this information in hand, the officer of the

escrow holder made further inquiry as to the notes which had been secured by the mortgage, and demanded their surrender with the original mortgage to the escrow holder. Mehlhorn replied to the effect that the notes had been cancelled and destroyed, but was asked to make a search, which he consented to do, and thereafter on the next day he delivered to the escrow holder the original mortgage, and notes secured thereby aggregating twenty-one thousand dollars in face value, stating that the notes so delivered were all of the notes that remained in existence, that the others had been paid off and destroyed, and that he had supposed, until the search revealed the contrary, that all of the notes had been so destroyed; Mehlhorn's assurances being reiterated to the effect that all of the notes secured by the Higgs mortgage had either been destroyed or were thus delivered to the escrow holder.

Mehlhorn's representations in this respect were believed and relied on. With the record in this shape and with these assurances, the escrow holder issued its policy of title insurance in favor of Mrs. Neu, and the transaction was closed in accordance with the terms of the written contract between Mrs. Neu and Mr. Mehlhorn, save and except that Mr. Mehlhorn never did pay the five thousand dollars representing Mrs. Neu's share of the income of the property prior to the partition of it.

Mrs. Neu took no personal part in any of these transactions. They were handled by and through her attorney and through the escrow holder entirely.

Before the expiration of the sixty-day period, in which the five thousand dollars in cash was to be paid and the delinquent taxes and assessments were to be discharged, Mr. Mehlhorn disappeared. Thereafter, he was adjudged a bankrupt, and also Osner & Mehlhorn, Inc., was thrown into bankruptcy. The deeds executed

by Mrs. Neu to August Mehlhorn, Jr., as grantee, conveying the half of the real property going to him under the settlement, were delivered to and accepted by the trustee in bankruptcy of Mehlhorn's estate, and the property was there administered upon. Mrs. Neu took possession of the Ramshorn building prior to Mehlhorn's disappearance, and later, after Mehlhorn had made default in this respect, she paid out in excess of $11,300 in taxes and assessments against the property, and also spent considerable sums in reconditioning it.

After the disappearance of August Mehlhorn, Jr., it developed that, of the notes made by Raymond E. Higgs and secured by his mortgage to Osner & Mehlhorn, Inc., there were outstanding in the hands of purchasers for value notes aggregating $15,500 in face value, and eventually and for the purpose of this action, title to these notes was vested in the appellant as trustee, and he brought this action seeking judgment against Higgs and the foreclosure of the mortgage, which had already been satisfied, as we have related.

It is conceded that Osner & Mehlhorn, Inc., acting through August Mehlhorn, Jr., sold these notes before maturity for value, but none of the purchasers of the notes took any assignment of the mortgage or of any interest therein, and nothing was placed of record showing or tending to show that they or any of them had any interest in the mortgage or the debt secured thereby, the record revealing nothing as to any notes outstanding or as to the identity or interest of any of the persons who purchased and held the notes.

Appellant stresses the following points as reasons for a reversal: (1) That, as between the parties to this action, no recording of an assignment of the mortgage was necessary; (2) that Mrs. Neu was not a bona fide purchaser without notice of the rights of the note holders; and (3) that, in any event, the trial court incor-

rectly applied the rule of law announced in the case of *Beckmann v. Ward,* 174 Wash. 326, 24 P. (2d) 1091. We shall discuss all of these contentions according to our interpretation of their meaning.

■ Our present recording act, Rem. Rev. Stat., § 10596-1 [P. C. § 1914-1], clearly provides that the term "real property" includes mortgage liens; the term "purchaser" includes every assignee of a mortgage; and

"The term 'conveyance' includes every written instrument by which any estate or interest in real property is created, transferred, mortgaged or assigned or by which the title to any real property may be affected."

Section 10596-2 [P. C. § 1914-2] provides:

"A conveyance of real property . . . may be recorded . . . Every such conveyance not so recorded is void as against any subsequent purchaser or mortgagee in good faith and for a valuable consideration from the same vendor, his heirs or devisees, of the same real property or any portion thereof whose conveyance is first duly recorded. An instrument is deemed recorded the minute it is filed for record."

While the language is permissive in form, the effect of a failure to record is stated so positively as to require no interpretation.

This statute was discussed in the case of *Price v. Northern Bond & Mortgage Co.,* 161 Wash. 690, 297 Pac. 786, and we now adopt and reaffirm what was there said.

The case of *Berger v. Baist,* 165 Wash. 590, 6 P. (2d) 412, 89 A. L. R. 164, does not depart from that holding. When the facts involved in that case are understood, it is abundantly clear that there this court held, in effect, that a first mortgage, though assigned to one who failed to record his assignment, did not by

that failure to record lose its place as a first mortgage and become junior to a second mortgage, even though the holder of the second mortgage had recorded his assignment. The case of *Berger v. Baist, supra,* is upon this subject, wholly inapplicable to the facts of the case at bar. One who fails to record an assignment of a mortgage must accept the results which the statute expressly directs.

It is not very seriously contended that Mrs. Neu was not a purchaser for value. Surely, the conveyance of her interest in the whole of the unpartitioned property was a valuable consideration, as much so in the eye of the law as cash would have been; and we therefore pass to the real contention, which is that she took the title with notice, or under conditions sufficient to put her upon notice, that there were outstanding notes in the hands of innocent purchasers.

It may be, as argued, that the fact of the deeding to Higgs, the making of the mortgage, and the immediate reconveyance by Higgs, gave notice that Mehlhorn, by this method, was endeavoring to borrow money upon his own property without becoming individually liable; and that, to complete his purpose, the notes might be negotiated. But, even so, one dealing with the property had a right, under the recording statute, to rely upon the record, and to assume that, if the notes were negotiated, anyone purchasing would take an assignment of the mortgage and record it as notice to the world.

It seems to be argued, however, that enough occurred between the escrow holder and Mehlhorn to put the former on notice and require it to pursue the inquiry further. It is difficult to say just what, if anything, further could have been done. The marginal release was questioned, and an affidavit was supplied which

apparently established authority in Mehlhorn, as the sole officer and sole owner of Osner & Mehlhorn, to so release the mortgage. The original mortgage and the notes were demanded, and the demand was met, in part. A reasonable excuse was given for the failure to produce all of the notes.

The only suggestion now offered as to what more might have been done is that the books of Osner & Mehlhorn might have revealed the truth, and an inspection of those books should have been demanded. It must be remembered that the escrow holder was dealing with a reputable business man, that it had no legal right to inspect the books and records of Osner & Mehlhorn, Inc., and could not have enforced such a demand. To make such a demand under the circumstances as they then appeared, would have been discourteous and offensive in the extreme, and quite beyond ordinary business practices.

The public record showing a release of the mortgage and the assurance of a reputable business man in corroboration of the record, we feel convinced would have satisfied any one of ordinary prudence, and therefore there was no culpable negligence in failing to go further. Mrs. Neu must be held to be a purchaser for value without notice.

The facts of this case make applicable the reasoning and the rule of *Beckmann v. Ward, supra.* Mrs. Neu and those who acted for her were dealing with real property, and not with promissory notes. The purchase of real property is one thing; the payment of a debt is quite another. From the beginning, we have held without deviation that a purchaser of real property may rely upon the record title, as is shown by our many cases which are cited in *Beckmann v. Ward.* Mrs. Neu was under no obligation to look beyond the record; and, so far as those representing her, out of

362

an abundance of caution, did inquire, the information obtained tended to corroborate the record.

The judgment is affirmed.

BEALS, C. J., MAIN, STEINERT, and MILLARD, JJ., concur.