**J. J. HENRY CO., Inc.**

v.

**The UNITED STATES.**

No. 116–64.

United States Court of Claims.

June 20, 1969.

Michael Lesch, New York City, for plaintiff. Jesse Climenko, New York City, attorney of record.

Russell W. Koskinen, Washington, D. C., with whom was Asst. Atty. Gen. William D. Ruckelshaus, for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION *

LARAMORE, Judge.

Plaintiff, a New York corporation engaged in naval architecture and engineer-

---

\* We are indebted to Chief Trial Commissioner Marion T. Bennett for his recommended opinion and findings of fact. We adopt his opinion on the Second Cause of Action, with minor modifications, and reach the same conclusion as he did on the Third Cause of Action, for different reasons.

ing, was a subcontractor to Gibbs Corporation of Florida which had a prime contract with defendant, acting through the Department of the Navy. The prime contract called for construction by Gibbs of an oceanographic research vessel known as the AGOR–3. Plaintiff's contract with Gibbs was to perform certain design work and to prepare certain plans and drawings which have given rise to this suit.

This case has been before the court on two prior occasions. Plaintiff's original petition, filed April 30, 1964, asserted a cause of action for $101,313.28 as the value of its lien rights in the AGOR–3 (pursuant to Fla.Stats.Ann. §§ 85.01 and 85.11) acquired when the prime contractor failed to pay. Plaintiff alleged that defendant destroyed these lien rights when title in the AGOR–3 vested in it.

Defendant filed its motion for summary judgment on August 14, 1964, and as an exhibit thereto submitted the prime contract (and modifications thereto) between defendant and the Gibbs Corporation. One of these modifications revealed to plaintiff (for the first time) that defendant still retained a fund of $100,-000 under the prime contract. In addition, plaintiff learned that defendant had used its AGOR–3 plans in the construction of subsequent AGOR vessels. (Plaintiff claims to have retained the right to be compensated for the use of such plans in future vessels in its agreement with Gibbs Corporation.)

Plaintiff opposed defendant's motion and cross-moved asking for leave to amend its petition by adding two causes of action based on the above newly revealed facts. On December 14, 1964, the court granted plaintiff's cross-motion and denied defendant's motion without prejudice to renewal after plaintiff amended its petition.

Plaintiff filed its amended petition and alleged as a second cause of action that it was sole owner of the plans, designs and drawings furnished Gibbs Corporation and that therefore it should have been compensated for any use of these plans on projects other than the AGOR–3. Defendant, without plaintiff's consent, had made these plans available to other builders and thereby, plaintiff argued, it had appropriated said plans by a "taking" in violation of the Fifth Amendment.

For its third cause of action, plaintiff alleged that Gibbs Corporation had assigned the AGOR–3 contract to Gibbs Shipyards, Inc. as part of a purchase agreement and that Shipyards, Inc. was substituted for Gibbs Corporation as prime contractor. By agreement, Gibbs Shipyards, Inc. assumed all obligations and liabilities of Gibbs Corporation, Inc. and agreed to act as if it were the original party.

At the time of the filing of the petition, defendant possessed a fund of $100,-000 owed to the prime contractor (Aerojet General Shipyards, Inc., the successor to Gibbs Shipyards, Inc.) which defendant had not then paid, and plaintiff alleged that it was entitled to this fund. Subsequent to the filing of the petition, defendant paid Aerojet the $100,000 subject to an indemnity agreement whereby Aerojet agreed to reimburse defendant to the extent of plaintiff's recovery, if any.

Defendant filed a second motion for summary judgment and on March 25, 1966 the court, by order, partially allowed defendant's motion by dismissing plaintiff's first cause of action, denying the motion as to the second and third causes without prejudice, and remanding the case to the commissioner for trial on the two remaining causes of action.[1] Plain-

---

1. In pertinent part the Order held:

   " * * * [It] is concluded that plaintiff's first cause of action should be dismissed on the ground that plaintiff had no lien on the vessel (or its components) since no lien under Florida law, if a lien existed, could attach prior to the vesting of title in the United States pursuant to Article 12(c) of the contract (see Armstrong v. United States, 364 U.S. 40, 42 [80 S.Ct. 1563, 4 L.Ed. 2d 1554] (1960). * * *"
   We did not decide whether a lien existed under Florida law. .

tiff's cross-motion was denied without prejudice and the case has been tried. We agree with the trial commissioner's conclusion that plaintiff cannot recover on either cause of action.

### Second Cause of Action

The general provisions of the contract between Gibbs Corporation and the Department of the Navy, provided in part:

> ARTICLE 11. PLANS AND OTHER DATA— * * *
>
> (c) If the Department shall so require, the Contractor will, at the cost of reproduction, furnish to other contractors constructing similar types of vessels copies of working and finished plans (including reproducibles), booklets, material schedules, purchase specifications, lists and other data relating to the construction of the vessel.
>
> * * * * * *
>
> (e) The furnishing or delivery of any of the copies of plans, booklets, material schedules, material orders, lists or other data required by the provisions of this Article shall not, either expressly or impliedly, constitute (i) any guaranty or warranty by the Contractor other than that they are correct copies of such data or (ii) any license for the use of any patented article or invention shown or listed. The Government shall have the right to use such data for the construction of other vessels or for any other purpose.

The subcontract between Gibbs and plaintiff did not expressly incorporate any of the terms of the main contract, which in fact was not seen by plaintiff prior to commencement of this suit. The plaintiff's contract was actually only a purchase order issued by Gibbs on July 28, 1960, which read:

> Drawings necessary for construction of AGOR–3 vessel. Price $6.75 per hour plus 2,000 per month for minimum period twelve months. Terms— work to be billed per month or oftener if required.

It is clear that nothing in the purchase order indicates any restriction on use of the drawings ordered. Plaintiff now says that negotiations with Gibbs leading up to the purchase order supplement it and show that plaintiff never consented to use of its plans for construction of any vessels other than AGOR–3. Some color is given to this assertion by the testimony of one of Gibbs' officials, David Jackson, who testified that prior to issuance of the purchase order he understood that, in view of conversations had with plaintiff's officials during negotiations, plaintiff would receive additional compensation for other use of its plans. Plaintiff had originally made a bid which Gibbs rejected because it was considered too high. The ultimate arrangement was for plaintiff to do less than the whole design and engineering job, Gibbs assuming a considerable part of it. The trouble with this understanding is at least sixfold. (1) It is uncorroborated by Mr. Gibbs, president of Gibbs Corporation, who signed the purchase order and participated in the negotiations leading thereto. (2) No such understanding is reflected by the terms of the purchase order or by any contemporaneous papers. (3) There is nothing on the drawings furnished by plaintiff which indicates any restriction on their use and plaintiff asserted no such restriction during the life of the contract or procurement of similar vessels. (4) Plaintiff admittedly prepared the plans in accordance with the specifications of the prime contract which came into existence before plaintiff's contract with Gibbs was completed and before the plans and drawings were made. This contract provided, in part:

> All plans, including tracings, vandykes, and blueprints, specified to be furnished by the contractor to the Bureau or its representatives, shall become the property of the Government.

(5) Mr. Jackson had no authority to modify this contract between his employer and the defendant and could not remember telling the Navy that he did so. (6) In any contract, prior negotiations are merged into it and the writing will be considered complete on its face, absent ambiguity.

Plaintiff's president testified that his understanding of the custom of the trade at the time of the purchase order in 1960 was that title to plans and drawings for *commercial* vessels remained in the architect. He admitted no acquaintance with respect to the trade practice on government contract work in 1960 but confessed knowledge of development of a definite trend in government contracts to vest title in the United States.

Plaintiff prepared 35 plans for Gibbs and billed the latter $113,111.98. Plaintiff was paid only $11,643.27, leaving $101,468.71 due and owing.

■ On August 31, 1960, defendant issued invitations for bids for construction of additional vessels of the AGOR class. Bidders were advised that if successful they could get copies of the AGOR–3 drawings at their own expense from Gibbs Corporation. Contracts were let for six additional vessels, the AGOR–4, –5, –6, –7, –9 and –10. The successful bidders for these vessels did obtain copies of some of the AGOR–3 plans and drawings from Gibbs Corporation at the cost of their reproduction. Many of these plans and drawings were used. It is plaintiff's evidence that, considering the value thereof, as represented by reduced billing costs to defendant, since the plans used did not again have to be paid for at their original cost, defendant saved $144,104.67[2] This is the sum plaintiff now claims, in requested findings under its second cause of action, as the reasonable value of the plans and drawings allegedly taken by defendant for public use without payment of just compensation, in violation of the Fifth Amendment to the Constitution. We find, however, that a taking has not occurred.

■ The cases have evolved certain standards to identify takings compensable under the Fifth Amendment. Generally, there must be an intent to take or such definite invasion of private property as to imply it. *See,* B. Amusement Co. v. United States, 180 F.Supp. 386, 389,

148 Ct.Cl. 337, 341 (1960); Biggs Rental Co. v. United States, 353 F.2d 1013, 173 Ct.Cl. 789 (1965), cert. denied, 384 U.S. 927, 86 S.Ct. 1443, 16 L.Ed.2d 531 (1966); Eyherabide v. United States, 345 F.2d 565, 170 Ct.Cl. 598 (1965).

The clear thrust of the authorities is that where the government possesses property under the color of legal right, as by an express contract, there is seldom a taking in violation of the Fifth Amendment. The amendment has limited application to the relative rights in property of parties litigant which have been voluntarily created by contract. Consolidation Coal Co. v. United States, 60 Ct.Cl. 608 (1925), appeal dismissed, 270 U.S. 664, 46 S.Ct. 204, 70 L.Ed. 788 (1926); Klebe v. United States, 57 Ct. Cl. 160 (1922), aff'd, 263 U.S. 188, 44 S.Ct. 58, 68 L.Ed. 244 (1923). *See generally* 2 NICHOLS, EMINENT DOMAIN § 6.1 (3d ed. 1963). Where, however, the government has not asserted its legal and contractual rights until after the liens of others have attached, and title was in the shipbuilder when materials were furnished, the assertion of the government's rights to destroy the liens of others is a compensable taking. Armstrong v. United States, 364 U.S. 40, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960), rev'g 169 F.Supp. 259, 144 Ct.Cl. 441 (1959). As we held in our Order dismissing the first cause of action, that is clearly not the situation in the instant case where the government's title to the plans was created by the prime contract and did not await a default termination and the invoking of a contract provision for a transfer of title after the liens of others had attached.

The language quoted from the prime contract in the specifications was known to plaintiff's Philadelphia office manager who prepared plaintiff's first bid estimate for Gibbs, although it is not clear that Mr. Henry, president of plaintiff corporation, knew about it. He explained at the trial that the provision was in a 380-page set of specifications. It ap-

2. We do not reach the question of whether this is a correct calculation of plaintiff's damages, had there been a taking.

peared there on page 20. The inference is that he overlooked what his Philadelphia manager found. The statement on page 20 of the specifications provided that all plans and blueprints furnished by the contractor became the property of the government. If plaintiff intended to restrict the government's use of the plans, it was obliged to give defendant some notification of that fact.

■ Plaintiff first gave definite notice to defendant that use of its drawings was intended to be restricted to the AGOR–3 when it filed its amended petition on January 21, 1965. Previously, plaintiff had failed to advise the government of its claimed title or the restricted use it intended for its plans. There is no legend on the plans and no evidence that plaintiff otherwise notified defendant. Generally, if the limitation is clearly stated as to persons entitled to see the plans and as to the uses to which they may be put, the restriction will be upheld. The only agreement in this case is the alleged oral understanding which plaintiff had with the Gibbs Corporation and we agree with the trial commissioner that the proof does not establish this agreement.

Plaintiff claims that it gave the Navy Department notice of its rights by two letters of March 1962. The letters are in evidence and neither refers to plaintiff's claimed retained ownership rights or makes any mention of restrictions on the future use of these plans in other government procurements.

Plaintiff's basic loss is because the party to whom it sold its plans did not pay for them. That party was not the government. The remedy does not therefore lie against the government, but against the defaulting party or its successor. If plaintiff retained any title to the AGOR–3 plans, which is most doubtful from the evidence, its right to anticipate profits from their sale was merely frustrated by defendant's use of them, according to its contract with Gibbs. Defendant had no notice of plaintiff's claim of

title, which appears from the evidence to have been plaintiff's afterthought. Defendant had no intention of taking anything belonging to plaintiff.

In the absence of some indication either on the face of the plans or through some communication to the government that it retained rights in the plans (and in the presence of an explicit statement in the specifications furnished plaintiff that the plans became the property of the government), we find that the government has not taken plaintiff's property within the meaning of the Fifth Amendment.

Before the court, plaintiff argued that the property taken by the government was its common law copyright in its plans and drawings. We have found that a taking did not occur, and we do not reach the question of the extent of plaintiff's common law copyrights, if any.

### Third Cause of Action

The Gibbs Corporation ran into difficulties and on December 19, 1961, after establishing a controlled account with the Atlantic National Bank of Jacksonville, sold its assets including work in progress under the prime contract for AGOR–3, to the America Corporation. In January 1962 Gibbs Corporation filed a petition for reorganization under the Bankruptcy Act. In February 1962 Gibbs Shipyards, Inc., a wholly owned subsidiary of America Corporation, was nominated and accepted as purchaser of Gibbs Corporation, by an addendum to the agreement of December 19, 1961. Gibbs then petitioned the referee in bankruptcy to sell its property identified in the agreement of December 19, 1961, as amended. The referee declared null and void all liens against the property of Gibbs Corporation, obtained by legal or equitable proceedings during the 4 months prior to January 23, 1962, and on March 2, 1962, authorized the sale which was consummated and finally confirmed in that month. On April 6, 1962, Gibbs Corporation was declared bankrupt.[3] On the

---

3. Gibbs had filed his petition for an arrangement under Chapter XI of the Bankruptcy Act. At a meeting of creditors, a tabulation showed that an insufficient

same date Gibbs Shipyards, Inc., Atlantic National Bank, and the defendant entered into a novation agreement whereby Gibbs Shipyards, Inc., took over all the bankrupt's liabilities and its assets, including the contract for the AGOR–3.[4]

On May 27, 1964, Gibbs Shipyards, Inc., was acquired by Aerojet-General Corporation, of Ohio, which together with Gibbs Shipyards, Inc., and defendant, entered into a novation agreement whereby the contract for AGOR–3 was transferred to Aerojet-General Shipyards, Inc., a subsidiary of Aerojet-General. The AGOR–3 was completed and delivered to the Navy, on November 29, 1962. As noted above at the time of completion the Navy retained the sum of $100,000.

When plaintiff learned of the retention of this sum, it amended its petition asking that the said $100,000 be paid to it, to at least partially satisfy the indebtedness of the prime contractor. Plaintiff looks to the defendant as a mere stakeholder.

After the amendment of the petition, the Navy, in February of 1965, paid Aerojet General Shipyards, Inc., the $100,000 subject to the above-mentioned indemnity agreement.

It is the position of defendant that the $100,000 was retained because it was not sure who was going to complete the contract, that being the prime concern of the government. However, it did hold the $100,000 for almost three years after completion by Aerojet.

▮ Plaintiff's claim asserts, *inter alia*, that by virtue of the novation agreement Gibbs Shipyards Inc. assumed all of the rights and obligations of Gibbs

Corporation in the AGOR–3 contract, including the amount owed plaintiff; that plaintiff can assert its equitable lien directly against the defendant in the absence of a Miller Act surety and that plaintiff, an architect and engineer, is a laborer or materialman within the meaning of Pearlman v. Reliance Insurance Co., 371 U.S. 132, 83 S.Ct. 232, 9 L.Ed.2d 190 (1962). We conclude that plaintiff is not a laborer or materialman, and we do not decide whether laborers or materialmen (in the absence of a surety) may assert their claims directly against a retained fund.

In this posture of the case it may well be said that the defendant was a mere stakeholder. However, assuming plaintiff has rights by virtue of the agreement which are assertable under *Pearlman*, plaintiff has one threshold hurdle to cross before its claim can be considered. Plaintiff must prove that it was either a laborer or a materialman before the language of Pearlman v. Reliance Insurance Co., *supra*, can come into play. The Supreme Court in *Pearlman* said:

> The final argument is that the *Prairie Bank*, Prairie State Bank v. United States, 164 U.S. 227, 17 S.Ct. 142, 41 L.Ed. 412, and *Henningsen* cases, Henningsen v. United States Fid. & Guar. Co., 208 U.S. 404, 28 S.Ct. 389, 52 L.Ed. 547, were in effect overruled by our holding and opinion in United States v. Munsey Trust Co., *supra*, 332 U.S. 234, 67 S.Ct. 1599, 91 L.Ed. 2022. The point at issue in that case was whether the United States while holding a fund like the one in this case could offset against the contractor a claim bearing no relationship to the contractor's claim there at issue. We held that the

---

number of unsecured creditors had filed proofs of claim and therefore the proposed plan of arrangement was rejected. The Bankruptcy Court announced that an order adjudicating Gibbs Corporation bankrupt would be entered.

4. In pertinent part, that agreement provided:
"2. * * * The Transferee further assumes all obligations and liabilities of,

and all claims and demands against the Transferor under the Contracts in all respects as if the Transferee were the original party to the Contracts.
　* 　* 　* 　* 　*
"4. * * * The Transferee hereby becomes entitled to all right, title, and interest of the Transferor in and to the Contracts in all respects as if the Transferee were the original party to the Contracts."

Government could exercise the well-established common-law right of debtors to offset claims of their own against their creditors. This was all we held. The opinion contained statements which some have interpreted as meaning that we were abandoning the established legal and equitable principles of the *Prairie Bank* and *Henningsen* cases under which sureties can indemnify themselves against losses. But the equitable rights of a surety declared in the *Prairie Bank* case as to sureties who complete the performance of a contract were expressly recognized and approved in *Munsey*, and the *Henningsen* rule as to sureties who had not completed the contract but had paid laborers was not mentioned. *Henningsen* was not even cited in the *Munsey* opinion. We hold that *Munsey* left the rule in *Prairie Bank* and *Henningsen* undisturbed. We cannot say that such a firmly established rule was so casually overruled.

We therefore hold in accord with the established legal principles stated above that the Government had a right to use the retained fund to pay laborers and materialmen; *that the laborers and materialmen had a right to be paid out of the fund;* that the contractor, had he completed his job and paid his laborers and materialmen, would

have become entitled to the fund; and that the surety, having paid the laborers and materialmen, is entitled to the benefit of all these rights to the extent necessary to reimburse it. Consequently, since the surety in this case has paid out more than the amount of the existing fund, it has a right to all of it. [Emphasis added; 371 U.S. at 140–142, 83 S.Ct. at 237.]

With respect to the above, we think it clear that plaintiff was not a materialman. All definitions of "materialman" are to the effect that something must be furnished that goes into the construction of a building or a vessel.[5] What is involved here are plans, drawings, and the performance of other drafting and engineering services. We think the above cannot be said to go into the construction of the vessel.

■■■■ More troublesome is the question of whether plaintiff can be classed as a "laborer". "Laborer" has been defined variously in the states.[6] Since this was a Florida transaction, and since no Federal law is cited controlling the situation, we look to an expression of the Florida courts and to the general weight of authority among the states [7] as to whether plaintiff can be classed as a laborer.[8]

Plaintiff argues that it has the same equitable right to the fund as that which

5. *See e. g.*, Hartford Accident and Indemnity Co. v. N. O. Nelson Mfg. Co., 291 U.S. 352, 54 S.Ct. 392, 78 L.Ed. 840 (1934); Roberts v. Spires, 195 Cal. 267, 232 P. 708, 37 A.L.R. 763 (1925); P. Grassi & Bro., Inc. v. Lovisa Pistoresi, 259 N.Y. 417, 182 N.E. 68, 83 A.L.R. 1149 (1932); Berger v. Baist, 165 Wash. 590, 6 P.2d 412, 89 A.L.R. 164 (1931).

6. In defining "laborers" in lien cases, most courts have adopted the dictionary definition—one who works at physical occupation or one whose work requires little skill. *See e. g.*, Rogers v. Dexter & P. R. Co., 85 Me. 372, 27 A. 257, 21 L.R.A. 528 (1893). Recent cases have extended that definition to certain unskilled workers. *See*, Myers v. Alta Construction Co., 37 Cal.2d 739, 235 P.2d 1 (1951).

7. In Miller Act cases, reference is often made to state law. In Wells Benz, Inc.

v. United States, 333 F.2d 89 (9th Cir. 1964), a subcontractor had recovered his Miller Act claim against Wells & Benz, the prime contractor, on the basis of an alleged breach of the subcontract. The court in a footnote said:

"Here the contracts were executed and were to be performed in California. Thus, we resort to the substantive law of that state to determine the rights and duties of the respective parties. * * * [at page 92]."

Plaintiff has, at least in part, relied on Florida lien statutes. We turn, therefore, to the law of Florida for some assistance.

The construction of "laborer" and "materialmen" in the Miller Act cases sheds some light on the problem. The Act is designed to afford persons supplying labor and materials for the construction of public buildings the same protection given

would have been assertable by a surety, had there been one. It classifies itself as a "laborer or materialman" for this purpose and in a letter filed with the court subsequent to oral argument it supported that proposition by arguing:

> [A] majority of States recognize that an architect is entitled to a lien for preparing plans and specifications that were used in the construction of a building or vessel. * * *

such persons in private contracting, and it has been held that "the words, 'labor and material' should be given the same meaning under the Miller Act as under State lien laws." United States for the Use of West v. Peter Kiewit & Sons' Co., 235 F.Supp. 500, 502 (D. Alaska 1964). *See also* Woods Const. Co. v. Pool Const. Co., 348 F.2d 687 (10th Cir. 1965). We are, of course, not strictly bound by the State lien law or the substantive definitions of a particular state statute. However, we note that in construing the predecessor of current section 270a of the Miller Act, the court in American Surety of New York v. United States ex rel. Barrow-Agee Laboratories, Inc., 76 F.2d 67, 68 (5th Cir. 1935) looked to the general weight of authority among the states for a definition of "labor" and commented:

> "It may be true that the term 'labor' in this statute, as generally in statutes relating to mechanics' liens, refers to physical labor rather than their technical and professional skill and judgment, but an architect or other skilled man *who actually superintendents the work as it is done is by the weight of authority furnishing labor.* * * *." [Emphasis added.]

8. The common law gives an architect no lien for his services. Although some states provide specific liens for architects, generally the question is whether a general lien statute includes architects as persons performing "labor." (*See e. g.*, Lamoreaux v. Andersch, 128 Minn. 261, 150 N.W. 908, L.R.A., 1915D, 204 (1915); Stephens v. Hicks, 156 N.C. 239, 72 S.E. 313, 36 L.R.A., N.S., 354 (1911); Gould v. McCormick, 75 Wash. 61, 134 P. 676, 47 L.R.A., N.S., 765 (1913).

A distinction has been drawn between architects whose services are limited to drawing plans and specifications and those whose services include superintending the construction. There is a sharp division among the states when only drawings are furnished and these decisions turn on the specific wording of the applicable statute.

In Florida, because of prior decisions which cast doubts upon architects' lien rights a statute was enacted which brought that State's law into accord with the prevailing rule by providing that an architect is entitled to a lien for preparing plans and specifications used to build a streetcar or vessel. See 6 Fla.Stat.Ann. §§ 85.01 and 85.11 * * *.[9]

Generally, architects who only furnish plans are excluded from the lien statute definition of "labor". (Lien permitted: *e. g.*, Marchetti v. Sleeper, 100 Conn. 339, 123 A. 845 (1924). No lien permitted: Palm Beach Bank & Trust Co. v. Lainhart, 84 Fla. 662, 95 So. 122 (1922); Libbey v. Tidden, 192 Mass. 175, 78 N.E. 313 (1906); Mitchell v. Packard, 168 Mass. 467, 47 N.E. 113 (1897); Stephens v. Hicks, *supra*).

Where, however, the architect also superintends the project, he is frequently permitted a lien under the general wording of "any labor" in the lien statute. *See e. g.*, Marchetti v. Sleeper, *supra*; Field & Slocomb v. Consolidated Mineral Water Co., 25 R.I. 319, 55 A. 757 (1903); Gould v. McCormick, *supra*.

In some cases, an architect both prepared plans and supervised construction but the courts allowed him a lien only for the superintending work. *See e. g.*, Mitchell v. Packard, *supra*, and Palm Beach Bank & Trust Co. v. Lainhart, *supra*.

9. The applicable Florida statutes, relied upon by plaintiff, are 6 Fla.Stats.Ann. §§ 85.01, 85.11 and 85.05. (The last section cited provides for liens in favor of professional engineers and surveyors who perform a service in connection with any land or property which may stand upon the land.) Sections 85.01 and 85.11 read:

> "§ 85.01. Liens upon property.

Liens prior in dignity to all others accruing thereafter shall exist in favor of the following persons, upon the following described property, under the circumstances hereinafter mentioned in part II of this chapter, to wit:

> * * * * *

> "§ 85.11. Liens for labor on or for vessels.

In favor of any person performing for himself or others, any labor, or furnishing any materials or supplies for use in the construction of any vessel or watercraft; and in favor of any person performing for himself or others, any labor or service of any kind, on, to or for the use or benefit of a vessel or watercraft, including mast-

Our examination leads us to conclude that the Florida statutes upon which plaintiff appears to rely for its claim to laborer status, do not support plaintiff's position.

Prior to the enactment of section 85.- 11 the prevailing rule in Florida was to deny a lien to architects who only furnish plans used in the construction of a building. Palm Beach Bank & Trust Co. v. Lainhart, 84 Fla. 662, 95 So. 122 (1922). In Street v. Safway Steel Scaffold Co., 148 So.2d 38, 41 (Fla.App., 1962), the court analyzed the new section:

> * * * [P]rior to the specific inclusion of engineering and architectural services in the Mechanics' Lien Law, these professions had no liens as contractors, subcontractors or laborers, [citing in a footnote, the decision in the *Palm Beach* case].
>
> * * * * * *
>
> *The Mechanics' Lien Law is limited by its terms to improvements to real property* * * *. [Emphasis added.]

Under Florida law, therefore, the only statutory protection for architects is that given to those who perform their services in connection with realty. The rule of the *Palm Beach Bank & Trust Co*. case remains applicable and limits lien rights to architects on non-realty projects to those who perform superintendent services.

Plaintiff also relies on the statement in section 85.11 to support its claims that architects on vessels are similarly protected. That section, however, does not on its face appear to protect plaintiff, and plaintiff has not cited any judicial interpretation of that section extending protection to architects.

The statute protects those persons who perform "any labor" for use in the "construction" of the vessel. Under the *Palm Beach* decision, an architect who furnish-

es only plans does not perform "any labor." The second clause of section 85.11 protects persons who furnish services "for the use or benefit of a vessel or its crew." That section appears to protect persons who furnish the vessel or its crew with services. There is no indication that the use of the word "services" in the second clause is to be extended to those who are to be protected during the construction of the vessels. We find, therefore, that plaintiff is not a "laborer" who would be protected by Florida lien law had this been a private contract.

The weight of judicial authority excludes architects who furnish only plans from the special protection afforded laborers. We find that plaintiff has no rights as a "laborer" and we do not reach the question whether laborers or materialmen who have not been paid can assert their rights against a retained fund in lieu of a surety in a case where no surety is present.

Plaintiff also has argued that it does not matter whether it is classed as a laborer because it is entitled to the fund in any case as compensation for its services. Traditionally, laborers and materialmen have been given a peculiar protection which has been denied to other creditors. Plaintiff is no more than a general creditor asserting rights against a retained fund. The Supreme Court in United States v. Munsey Trust Co., 332 U.S. 234, 240, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947) "recognized the peculiarly equitable claim of those responsible for the *physical* completion of building contracts to be paid from available moneys ahead of others whose claims come from the advance of money. * * * *"[10] A surety is given preference in its claim to retained moneys because it is obligated to pay the laborers and materialmen. If plaintiff, as a non-laborer or material-

---

ers, mates and members of the crew and persons loading or unloading the vessel or putting in or taking out ballast; upon such vessel or watercraft, whether partially or completely constructed and whether launched or on land, her tackle, apparel and furniture."

10. We note that the Court in that case also said: "We need not decide whether laborers and materialmen would have any claim to the retained percentages if both contractor and surety failed to pay them." [332 U.S. at 242, 67 S.Ct. 1602.]

man were to be given rights against a retained fund, there appears to be no reason to deny other general creditors involved in the contract similar rights against the retained fund. Were that the case here, the laborer and materialman's special protection would be effectively ended. Laborers or materialmen *may* have rights against a retained fund, but in the absence of that special class of persons, as is the case here, we find that nonlaborers are within the general rule of United States v. Munsey Trust Co., *supra*, and cannot assert rights directly against a retained fund.

Accordingly, plaintiff is not entitled to recover on any of its claims, and the petition is dismissed.